**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| TIM F. WOOD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   **Case No. 05-CV-532-TCK-FHM** |
| | ) |
| HANDY & HARMAN COMPANY, | ) |
| AND CONTINENTAL INDUSTRIES, | ) |
| INC. | ) |
| | ) |
| Defendants. | ) |

**OPINION AND ORDER**

Before the Court are Defendants Handy & Harman Company and Continental Industries, Inc.'s Motion to Strike Plaintiff's Affidavit Exhibits Attached to Plaintiff's Brief in Response to Defendants' Motion for Summary Judgment ("Motion to Strike") (Docket No. 123) and Defendants Handy & Harman Company and Continental Industries, Inc.'s Motion for Summary Judgment (Docket No. 94).

**I.      Parties and Claims**

Plaintiff Tim F. Wood ("Wood") was employed by Defendant Continental Industries, Inc. ("Continental") as Vice President of Operations ("VPO").  Continental is located in Tulsa, Oklahoma and is in the business of manufacturing connectors for natural gas, water, and electric industries.  Continental is a wholly owned subsidiary of Defendant Handy & Harman Company ("Handy & Harman"), which is located in New York and is also in the business of manufacturing connectors for natural gas, water, and electric industries.  Wood, as VPO of Continental, reported directly to executives at Handy & Harman in New York. Continental and Handy & Harman are referred to collectively as Defendants.

1

On or around November 21, 2003, Wood's superiors at Handy & Harman ordered him to fly from Tulsa to New York for a meeting with top executives.  Wood did so.  On November 25, 2003, at the meeting in New York, Dan Murphy ("Murphy"), President of Handy & Harman, gave Wood the option of resigning or being terminated.  Defendants claim that Wood was terminated due to a conflict of interest created by Wood's running a privately owned manufacturing business on Continental's company time.  Wood claims that his termination was based on his refusal to deliver a memorandum to a subordinate employee, Ruby Carter ("Carter"), regarding her request for a leave of absence under the Family and Medical Leave Act ("FMLA").  Wood alleges that he refused to deliver the memorandum because he believed it violated Carter's FMLA rights.  Wood further alleges that his termination was based on his "reporting" to executives at Handy & Harman certain environmental concerns related to a spilling or dumping of toxic chemicals on Continental property.  Based on these allegations, Wood brings the following causes of action:  (1) retaliatory discharge under the FMLA; (2) wrongful termination in violation of public policy; (3) breach of an implied contract created by Defendants' policy manuals; and (4) negligent and intentional infliction of emotional distress.

## II.    Motion to Strike

Defendants moved to strike four affidavits attached as exhibits to Plaintiff's Response to Defendants' Motion for Summary Judgment.  These affidavits are the sworn testimony of (1) Plaintiff Tim Wood, (2) Ruby Carter, the employee who requested the FMLA leave, (3) Bruce Neal ("Neal"), Continental's Plant Manager at the relevant time, and (4) Joanna Horne ("Horne"), Continental's Human Resource Administrator at the relevant time.  Defendants argue that the affidavits contain statements that are inconsistent with prior

2

sworn testimony of the affiant, contain conclusory statements with no evidentiary support, contain irrelevant statements, and/or contain statements that are not based on personal knowledge of the affiant.  Defendants move the Court to strike them in their entirety or to strike the offending portions.

Defendants argue that paragraphs 8, 11, and 24 of Wood's affidavit are inconsistent with his prior deposition testimony and are attempts to create "sham" factual issues.  When there is a conflict between prior sworn testimony and an affidavit, "courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue."  *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986).  Relevant factors to the analysis include whether the affiant was cross examined in his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony, and whether the earlier testimony reflects confusion which the affidavit explains.  *See id.*

In paragraph 11 of his affidavit, Wood stated:  "During a meeting on November 25, 2003, in the offices of Dan Murphy at Handy & Hartman, I was fired.  Present in that meeting were Mr. Dan Murphy; Mr. Paul Dixon, General Counsel; and Mr. Pete Marciniak.  I was not given a reason for my termination."  (Wood Aff. ¶ 11, Ex. C to Plf.'s Resp. to Defs.' Mot. for Summ. J.)  In his prior sworn deposition testimony, when asked what occurred at the November 25, 2003 termination meeting, Wood stated that he asked those present why he was being terminated.  Wood testified that Murphy responded to that question as follows:  "He [Murphy] was very brief, but very direct.  He said, you've been running a business on company time, you have two choices, you can resign and sign this noncompete agreement or we will terminate you.  That is the extent of his answer."  (Wood

Dep. 100:1-20, Ex. 2 to Plf.'s Mot. to Strike.)  Thus, there is a discrepancy between these two statements.

Wood explains this discrepancy by asserting that he was referring in his affidavit to an earlier portion of the meeting and that he was referring in his deposition to a later portion of the meeting when a reason was given.  Thus, Wood admits that Murphy gave Wood a reason for his termination during the November 25, 2003 meeting.  Paragraph 11, as written, states that Wood did not receive a reason for his termination at any point during the November 25, 2003 meeting.  The Court concludes this is clearly inconsistent with his prior sworn testimony and that all relevant factors weigh in favor of striking.  Thus, the last sentence of paragraph 11 is stricken.

In paragraph 25 of his affidavit, Wood stated that he was asked to sign and acknowledge a set of employment rules and policies when he began employment in 1995. (*See* Wood Aff. ¶ 25, Ex. C to Plf.'s Resp. to Defs.' Mot. for Summ. J.)  In his deposition, Wood's lawyer referred him to the 1999 version of the handbook but then asked him if he reviewed an employee handbook in 1995.  Wood answered that he did not review an employee handbook in 1995 and that he did not recall if he reviewed a policy manual at that time.  (*See* Wood Dep. 18-31, Ex. B to Plf.'s Resp. to Defs.' Mot. to Strike.)  The Court finds that, in context of the confusing line of questioning by his attorney, the statement in the affidavit and the statement in the deposition are not necessarily inconsistent.  Further, the acknowledgment form in the record dated March 13, 1995 supports Wood's affidavit testimony.  The motion to strike paragraph 25 is denied.

In paragraph 8 of his affidavit, Wood stated that he objected to the memo written to Carter because he thought it was contrary to "his understanding" of her rights under the

4

FMLA.  (*See* Wood Aff. ¶ 8, Ex. C to Plf.'s Resp. to Defs.' Mot. for Summ. J.)  Defendants argue that this is inconsistent with Wood's prior deposition, wherein he stated he did not know how much FMLA leave Carter had used at the time he was asked to deliver the memo. (*See* Wood Dep. 192:22-193:11, Ex. 2 to Plf.'s Mot. to Strike.)  The Court concludes these two statements are not clearly inconsistent.  Wood could have an "understanding" about Carter's FMLA rights, based on his general knowledge of the FMLA and Carter's prior amount of leave, without specifically knowing the amount and classification of Carter's prior leave.  The motion to strike paragraph 8 is denied.

All other objections raised in the Motion to Strike, including those based on lack of evidentiary support, irrelevance, and lack of personal knowledge, will be addressed in the summary judgment discussion if and to the extent necessary to resolve the motion for summary judgment.  Unless the Court specifically addresses an objection, the motion to strike is denied.

**III.    Motion for Summary Judgment**

  A.    Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006) (citation omitted). The Court resolves all factual disputes and draw all reasonable inferences in favor of the non-moving party. *Id.* (citation omitted).  However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).

B.     Wood's Failure to Comply with Local Rule 56.1(c)

Wood's response brief in opposition to Defendants' motion for summary judgment contains a section entitled "Disputed Facts Precluding Summary Judgment." This section fails to comply with Northern District Local Civil Rule 56.1(c) because it fails to "state the number of the movant's facts that is disputed" and fails to specifically controvert Defendants' statement of material facts. *See* LCvR 56.1(c). Unless specifically controverted, "[a]ll material facts set forth in the statement of material facts of the movant shall be deemed admitted for the purpose of summary judgment." *See id.* Accordingly, the Court first grants summary judgment to Defendants on this basis.

Because Wood did attach an evidentiary record, because the parties have expended resources in addressing the merits, and because the Court favors resolving disputes on their merits, the Court considered all evidence in the record despite Wood's technical failures. After consideration of all such evidence, the Court also grants summary judgment to Defendants for the substantive reasons set forth below.

C.     FMLA Retaliation

Plaintiff alleges that his termination violated the FMLA's prohibition against "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). Generally, this prohibition "protects employees from suffering discrimination because they have exercised their rights under the FMLA." *Parker v. Hanhemann Univ. Hosp.*, 234 F. Supp. 2d 478, 488

(D.N.J. 2002).  It is referred to as the "retaliation" or "discrimination" theory of recovery under the FMLA.  *Id.*[1]

To establish a prima facie FMLA retaliation claim, Wood must show that: (1) he engaged in a protected activity; (2) Defendants took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action.  *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006).  If Wood establishes a prima facie case, the burden shifts to Defendants to demonstrate a legitimate, non-discriminatory reason for their termination decision.  *Id.* at 1172.  If they do so, Wood must then "show that there is a genuine dispute of material fact as to whether [Defendants'] explanations for terminating [his] employment are pretextual."  *Id.*

### 1.    *Protected activity*

Typically, a plaintiff has engaged in the necessary "protected activity" simply by taking or requesting FMLA leave.  Here, the potential protected activity is Wood's opposition to Carter's treatment.  *See* 29 U.S.C. § 2615(a)(2) (prohibiting "discrimination

---

[1] The plaintiff in an FMLA retaliation case is typically an employee who took or attempted to take FMLA leave and then suffered an adverse employment action.  *See, e.g.,* 29 U.S.C.A. § 2615(a)(2) (annotations) (citing no case in which the plaintiff was someone other than the employee who actually took or invoked FMLA leave); *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1325 (10th Cir. 1997) (plaintiff alleged she was disciplined for taking FMLA leave).  In this case, Wood alleges that Defendants retaliated against him for "opposing" Defendants' treatment of Carter, another employee.  Although no case has been found or cited that applies Section 2615(a)(2) to an action brought by someone other than the employee who invoked FMLA rights, the statutory language itself indicates that an action may be brought by any individual who "opposes" an unlawful practice under the FMLA.  *See* 29 U.S.C. § 2615(a)(2).  In addition, two provisions of the relevant code of regulations indicate that such an action may be brought.  *See* 29 C.F.R. § 825.220(a)(2) and (e).  Therefore, although perhaps novel, Wood's invocation of Section 2615(a)(2) is proper.

against any individual for *opposing* any practice made unlawful by this subchapter")
(emphasis added).  The alleged facts surrounding Wood's "opposition" are as follows.  On
November 18, 2003, Amy Brogle ("Brogle"),[2] a human resources manager at one of
Defendants' subsidiaries in Massachusetts who was on temporary assignment at Continental,
asked Wood to deliver a memorandum to Carter.  Carter was, at that time, taking leave she
had requested to attend to her husband's illness.  The memo informed Carter that her leave
of absence did not "qualify under the Family and Medical Leave Act."[3]  Wood refused to
deliver the memo because he believed it violated Carter's FMLA rights.

Defendants first argue that their termination of Wood did not violate the FMLA's
retaliation provision because the memo's content did not result in an "unlawful" practice
under the FMLA.  *See* 29 U.S.C. § 2615(a)(2) (prohibiting "discrimination against any
individual for opposing any practice *made unlawful* by this subchapter") (emphasis added).
However, according to pertinent regulations, a plaintiff in this type of FMLA retaliation case
does not have to show that the conduct opposed was *actually* unlawful in order for his
opposition to be protected.  The relevant regulation provides:  "Individuals, and not merely
employees, are protected from retaliation for opposing (e.g., file a complaint about) any
practice which is unlawful under the Act.  *They are similarly protected if they oppose any*

_____

[2] Brogle is also referred to in the record as Amy Hoagland and Amy Ratura.

[3] The memo provides in pertinent part:  "Your request for a Personal Leave of
Absence in conjunction with your vacation time does not qualify under the Family and
Medical Act of 1993.  Therefore, your request is approved if you understand and accept
the following conditions . . . ."  (Ex. 5 to Defs.' Mot. for Summ. J.)  The executed memo
in the summary judgment record is addressed "from" Joanna Horne, is dated November
21, 2003, and was signed by Ruby Carter and Joanna Horne on December 3, 2003.  (*See id.*)

*practice which they reasonably believe to be a violation of the Act or regulations.*"  29 C.F.R. § 825.220(e) (emphasis added).[4]  Thus, the proper analysis is not limited to whether Defendants' decision regarding Carter's leave, as set forth in the memo, was actually in violation of the FMLA.  Instead, Wood can also demonstrate he engaged in protected activity if he *reasonably believed* such decision violated Carter's FMLA rights.[5]

Wood has stated in his affidavit that he *subjectively* believed the decision in the memo to deny the request for FMLA leave violated Carter's FMLA rights.  (Wood Aff. ¶ 8, Ex. C to Plf.'s Resp. to Defs.' Mot. for Summ. J. ("I objected to it because I thought it was contrary to what my understanding was of Ruby Carter's rights under the FMLA.").)  With respect to whether this subjective belief was objectively reasonable under the circumstances, the Court concludes that facts in the record preclude summary judgment.  Wood's evidence potentially indicates that three relevant individuals at Continental, including the Vice President, the Plant Manager, and the Human Resources Administrator, had a different understanding than Brogle of whether Carter was entitled to FMLA leave during her husband's illness.  Examples of facts precluding summary judgment on the reasonableness of Wood's belief include: (1) Carter's testimony that she was told by Bruce Neal, Continental's Plant Manager and her supervisor, that FMLA leave was available for her husband's illness because prior leave she had taken for her own back surgery was considered

_____

[4]  The Court found no cases citing this subsection of the regulation.

[5]  Carter was eventually terminated, approximately four months after Wood's termination.  Defendants correctly argue that the only relevant treatment of Carter in this case is the decision set forth in the memo because that is the only treatment that Wood was potentially "opposing."

medical leave (Carter Aff. ¶ 9, Ex. A to Plf.'s Resp. to Defs.' Mot. for Summ. J.);[6] (2) Neal's corroborating testimony that medical leave and FMLA leave are treated differently at Continental, that he expressly authorized Carter to take FMLA leave, and that "[e]veryone at Continental Industries knew Ruby Carter was on FMLA leave to be with her husband, but no one objected to this or complained until Amy Brogle prepared the memo of November 21, 2003" (Neal Aff. ¶ 6-8, Ex. B to Plf.'s Resp. to Defs.' Mot. for Summ. J.);[7] and (3) testimony of Continental's Human Resource Administrator, Joanna Horne, that she did not prepare the memo Wood was asked to deliver, despite the fact that the memo purported to be from Horne (Horne Aff. ¶4, Ex. E to Plf.'s Resp. to Defs.'s Mot. for Summ. J.).[8]

To be clear, the Court makes no finding regarding the actual lawfulness of any decision made or expressed in the memo. The Court merely holds that a question of fact exists as to the *reasonableness of Wood's belief* that the memo violated Carter's FMLA rights and, in turn, the first element of whether Wood engaged in protected activity. Nor

---

[6] To the extent Defendants sought to strike this portion of Carter's affidavit, such motion is denied because the statements are not conclusory, self-serving, or lacking in evidentiary support.

[7] Defendants moved to strike these portions of Neal's affidavits as conclusory, self-serving, and inconsistent with the 1999 employee handbook. This motion is denied. The Court finds that testimony of Continental's Plant Manager regarding the company's leave policies is not conclusory or self-serving. The fact that the testimony may be inconsistent with other witness' testimony or the text of the employee handbook does not provide grounds to strike.

[8] The third fact supports the reasonableness of Wood's belief because Brogle was on temporary assignment in Tulsa. Wood may have believed that Brogle was not familiar with Carter's specific situation or with Continental's leave practices and may have questioned why Horne did not prepare the memo herself.

does the Court make any finding regarding the actual lawfulness or unlawfulness of Carter's eventual termination, which is irrelevant in this case.

2.      *Causation*

Wood's termination satisfies the second element of an adverse employment decision. To establish the third element of a prima facie case of retaliation, Wood must show a causal connection between his alleged protected activity of refusing to give Carter the memo and Defendants' decision to terminate his employment.  *See Metzler*, 464 F.3d at 1171.  To establish a causal connection, a plaintiff "must show that the individual who took adverse action against him knew of the protected activity." *Williams v. Rice*, 983 F.3d 177, 181 (10th Cir. 1993) (Title VII retaliation case).  The decision maker's knowledge of protected activity must be shown in the first instance because "proximity between a specific [protected activity] and the alleged retaliatory act is meaningless unless those who caused the alleged retaliatory act to occur are shown to be aware of the specific activity."  *Hysten v. Burlington N. and Santa Fe Rw. Co.*, 296 F.3d 1177, 1184 (10th Cir. 2002).  If a plaintiff shows knowledge of a protected activity, a very close temporal proximity between the protected activity and the termination is sufficient to establish a prima facie case.  *See Metzler*, 464 F.3d at 1171.[9]  "The 'critical inquiry' at this prima facie stage is 'whether the plaintiff has demonstrated that the [employer's] action occurred under circumstances which give rise to an inference of unlawful discrimination.'" *Metzler*, 464 F.3d at 1171 (quoting *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002)).

_____

[9]  In most FMLA retaliation cases, the employer knows about the "protected activity" because the activity is taking or requesting FMLA leave.  *See, e.g., Metzler*, 464 F.3d at 1171.  Here, the knowledge requirement is at issue because Defendants claim that the decision maker was unaware of Wood's alleged protected activity.

11

Plaintiff's alleged timeline of events is helpful in analyzing whether an issue of fact exists as to causation.  On November 18, 2003, Wood had the confrontation with Brogle, which he described as follows:

> On November 18, 2003, Amy Brogle brought me a memo directed to Ruby Carter.  The memo indicates that it is from Joanna Horne, but I do not believe Joanna Horne prepared the memo.  I read the memo and was very surprised, because I thought it was critical of Ruby Carter and challenged her right to the FMLA leave.  I was aware that Ruby Carter was away from work on FMLA leave because her husband had been diagnosed with a terminal medical condition.  Amy Brogle indicted she wanted me to take this memo to Ruby Carter and to get her to sign it thereby acknowledging what was in the memo.  I read the memo and told Amy Brogle that I disagreed and that I would not deliver it.  I objected to it because I thought it was contrary to what my understanding was of Ruby Carter's rights under the FMLA.  Amy Brogle became angry and irate, and she left.  I sensed there might be some trouble resulting from my decision, because Amy Brogle was here on special assignment from Handy & Harman.

(Wood Aff. ¶ 8., Ex. C to Plf.'s Resp. to Defs.' Mot. for Summ. J.)  Wood never delivered this memo.  Horne, who was employed at the relevant time as Human Resource Administrator of Continental, stated that Brogle prepared the memo despite the fact that Horne's name was on the "from" line of the memo.  (Horne Aff. ¶ 4., Ex. E to Plf.'s Resp. to Defs.' Mot. for Summ. J.)  Horne further stated as follows:

> After the memo of November 21, 2003, was prepared, Amy Brogle told me she took it to Tim Wood and asked him to deliver it to Ruby Carter and have her acknowledge it.  Amy Brogle reported to me that Tim Wood objected and refused to deliver the letter.  When Amy Brogle reported this to me she was very angry and irate.  She called Tim Wood an "(expletive) idiot."  I had never seen her so angry.

(*Id.* ¶ 5.)

On November 21, 2003, three days following Wood's confrontation with Brogle, Wood received a call from executives at Handy & Harman in New York.  Wood was told not to return to his office and to come to Rye, New York for a meeting with top executives.

(Wood Aff. ¶ 9, Ex. C to Plf.'s Resp. to Defs.' Mot. for Summ. J.)   At a meeting held November 25, 2003 in Rye, New York, Wood was terminated by Murphy. (*Id.* ¶ 11.)  Wood believes that he "was wrongfully fired because [he] opposed the actions Amy Brogle wanted to take regarding Ruby Carter in violation of the FMLA." (*Id.* ¶ 12.)  Based on this sequence of events, Wood can easily establish a close temporal proximity, approximately seven days, between the protected activity and his termination.  *See Metzler*, 464 F.3d at 1171 (finding that a termination four to six weeks following the protected activity was "closely connected in time").

However, fatal to his claim, Wood presented no evidence giving rise to a reasonable inference that Brogle (or anyone else) told Murphy, the decision maker, about Wood's refusal to deliver the memo.  Murphy denies that Brogle told him about her confrontation with Wood regarding Carter's FMLA leave. (Murphy Dep. 59:14-18, Ex. 3 to Defs.' Mot. for Summ. J.)  Brogle denies ever discussing the matter with Murphy.  (Brogle Dep. 100:24-101:7, Ex. 7 to Defs.' Mot. for Summ. J.)  The only evidence that could create an inference that Brogle communicated this information to Murphy consists of the following:  (1) At a point in time "days" before the meeting in New York on November 25, 2003, Murphy testified that he learned Wood was operating his own business on company time and began an investigation of Wood.  (Murphy Dep. 35:1-11, Ex. 3 to Def.'s Mot. for Summ. J.)  (2) Subsequently, Murphy contacted Brogle as part of his investigation of Wood.  (*Id.* 47:19-48:2.)  (3) Either by voicemail or in an actual conversation,[10] Brogle gave an evaluation of Wood to Murphy in which she discussed his attendance and performance. (*Id.* 55:24-59:18;

---

[10]  Brogle and Murphy gave inconsistent testimony in this regard.

Brogle Dep. 113:15-115:4.) These facts, construed most favorably, suggest that Brogle *may* have spoken with Murphy after her confrontation with Wood and before Wood's termination. Wood argues that the fact that this conversation occurred between Brogle and Murphy regarding Wood's performance, combined with Horne's testimony that Brogle was extremely angry at Wood following their confrontation, is sufficient to create a question of fact as to whether Brogle told Murphy about Wood's refusal to deliver the memo to Carter.

The Court finds Wood's circumstantial evidence insufficient to create a question of fact on the issue of Murphy's knowledge of the protected activity. It is undisputed that Murphy initiated contact with Brogle. This refutes the possibility that Brogle immediately informed Murphy of Wood's refusal to deliver the memo following the November 18, 2003 confrontation. It also refutes the possibility that the confrontation involving Carter's FMLA rights prompted Murphy's investigation into Wood. Although they had a conversation, Brogle denied telling Murphy about the alleged protected activity and Murphy denied receiving any information about the alleged protected activity. The circumstantial evidence that this conversation occurred and that Brogle was previously angry at Wood is, in the Court's view, insufficient to create a reasonable inference of causation between the two events. *Compare Rice*, 983 F.2d at 181 (affirming grant of summary judgment where plaintiff failed to present any evidence showing that decision maker knew of protected activity); *Jones v. Barnhart*, 349 F.3d 1260, 1269 (D. Kan. 2003) (granting summary judgment where plaintiff presented no evidence that decision maker was aware of her outspokenness on racial issues) *with Anderson v. Phillips Petroleum Co.*, 861 F.2d 631, 625 (10th Cir. 1989) (affirming denial of summary judgment where there was evidence that a supervisor was aware of protected activity and supervisor "sometimes communicated

14

adverse job-related information" to the decision maker).  In contrast to the supervisor in *Anderson*, the potential communicator of the information in this case has expressly denied providing it.

Wood has also offered evidence to show that Defendant's proffered reason of Wood's improper use of company time to run his own business was a pretext for FMLA discrimination.  For example, Wood alleges that he had an exemplary work record and that Defendants knew about his separate business and never before raised any objection.  (Wood Aff. ¶¶ 4-7, Ex. C to Plf.'s Resp. to Defs.' Mot. for Summ. J.)  The Court finds, considering the pretext evidence in its entirety, that it is also insufficient to create any reasonable inference or question of fact on the issue of whether Murphy had knowledge of the protected activity at the time of the termination.  Accordingly, Wood has failed to establish the third element of his prima facie case.  The Court will not address the issue of whether Wood has created a question of fact as to whether Defendants' proffered reason for termination was pretextual, and Defendants are granted judgment on this claim as a matter of law.

D.      *Burk* Tort

Wood's second cause of action alleges that Wood's termination was wrongful because it was in violation of Oklahoma public policy.  Wood alleges that, on November 12, 2003,  he reported to David Kelley, the environmental director for Handy & Harman, that he "was concerned about a possible toxic spill or pollution" related to a pit or tank where Trichloroethylene was previously stored on Continental property.  (Wood Aff. ¶ 22, Ex. C. to Plf.'s Resp. to Defs.' Mot. for Summ. J.)   Wood alleges that this "internal whistleblowing" was at least one reason for his termination.  Such a cause of action is commonly known under Oklahoma law as a *Burk* tort.  *See Wilburn v. Mid-South Health*

*Dev't, Inc.*, 343 F.3d 1274, 1277 (10th Cir. 2003) (citing *Burk v. K-Mart*, 770 P.2d 24 (Okla.

1989)).  The *Burk* tort is a judicially created exception to the employment-at-will doctrine.

*Id.*  The public policy exception must be tightly circumscribed and is available only when

an employee is discharged for refusing to act in violation of an established public policy or

for performing an act consistent with a clear and compelling public policy.  *Id.*

Defendants move for summary judgment on Wood's *Burk* tort claim on grounds that

Plaintiff has still, at this stage of the proceedings, failed to "identify an Oklahoma public

policy goal that is clear and compelling and articulated in existing constitutional, statutory

or jurisprudential law" in support of his claim.  *See Clinton v. State of Okla., ex rel. Logan*

*Cty. Election Bd.*, 29 P.3d 543, 546 (Okla. 2001).  In its Order of December 8, 2005, this

Court denied Defendants' Motion to Dismiss based on the same argument, finding that the

type of internal whistleblowing alleged in this case was sufficient to survive a motion to

dismiss despite Wood's failure to cite a specific statutory or constitutional basis for the

public policy.  However, the Court cautioned Wood that he "must, during discovery, identify

a 'public policy goal that is clear and compelling and articulated in existing constitutional,

statutory or jurisprudential law' such that Defendants know precisely what public policy is

at issue in the case and all bases for such public policy (statute, constitution, and/or case

law)."  (Docket No. 14 at 7.)

In subsequent discovery responses, Wood identified the following as the "public

policy" bases for his *Burk* claim:

> To prohibit conduct in Oklahoma in violation of state or
> federal environmental laws which, as a result of the person's
> reckless disregard thereof, actually endangers, or reasonably
> the potential to endanger, human health or the environment,
> and to prevent "pollution" which is defined as follows:

16

> "Pollution" means the presence in the environment of any substance, contaminant or pollutant, or any other alteration of the physical, chemical or biological properties of the environment or the release of any liquid, gaseous or solid substance into the environment in quantities which are or will likely create a nuisance or which render or will likely render the environment harmful or detrimental or injurious to public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life, or to property.

(*See* Plaintiff's Answers to Continental Industries' Second Interrogatories, Supplemental Ex. 11 to Defs.' Mot. for Summ. J.)  This general answer discussing pollution did not cite to any statute or case law.

When asked to list the specific bases for his *Burk* claim, Wood listed the following: "(1) Oklahoma Environmental Quality Code, 27A OSA § 2-1-101 *et seq.*, (2) *Dulaney v. The Oklahoma State Department of Health*, 868 P.2d 676 (Okl. 1993); *Sharp v. 251st Street Landfill, Inc.*, 925 P.2d 546 (Okl. 1996); and *Messer-Bowers Company, Inc. et al. v. State of Oklahoma ex rel. Oklahoma Water Resources Board, et al.*, 8 P.3d 877 (Okl. 2000)." (*See id.*)  An analysis of this statutory citation and case law fails to reveal any clear and compelling Oklahoma public policy upon which Wood can properly base a *Burk* tort claim.

First, Wood makes a broad citation to the Oklahoma Environmental Quality Code ("OEQC"), which begins on page 32 and ends on page 411 of Title 27A of the Oklahoma Statutes, without any narrowing to a particular statutory provision. The Court specifically cautioned Wood against this type of broad citation and ordered Wood to identify a public policy in discovery that would allow Defendants to properly defend the *Burk* claim. Defendants served second interrogatories requesting such information and attaching the

Court's Order.  Wood still cited the entire OEQC, leaving Defendants to discern upon what Wood relied within the hundreds of pages cited.

The Court concludes that Wood's general citation to the OEQC is insufficient to serve as an "Oklahoma public policy goal that is clear and compelling and articulated in existing constitutional, statutory or jurisprudential law."  *See Burk*, 770 P.2d at 29 (courts must "screen cases on motions to dismiss for failure to state a claim or for summary judgment if the discharged employee cannot allege a clear expression of public policy").  *See also  Wilburn*, 343 F.3d at 1281 (holding that general citation to Uniform Controlled Substances Act was insufficient to show articulation of policy that governed plaintiff's situation or encouraged the type of reporting that occurred in that case); *Kisselburg v. AAR Allen Group, Inc.*, No. 05-0715, 2005 WL 2897431, at *3 (W.D. Okla. November 1, 2005) (holding that plaintiff's general citation to Aeronautics Commission Act, which addressed standards of aircraft repair or maintenance, where whistleblowing involved negligent or dangerous repair of aircraft was insufficient to support a *Burk* claim because "the existence of laws which pertain to the same general subject area as the whistle-blowing pertains to is not enough to allow a *Burk* tort").   As in the cases cited above, Wood's failure to identify a particular section or provision of the OEQC prevents the Court from being able to discern whether and in what manner the OEQC governed Defendants' conduct and whether a specific public policy prevented Wood's termination.  Summary judgment on this issue is particularly appropriate where the Court denied a motion to dismiss and cautioned Wood to provide Defendant with a more definite statement of public policy during discovery.

Second, the Court has reviewed the case law identified by Wood in discovery and concludes that such case law does not provide a clear and compelling public policy goal to

18

support his *Burk* tort claim. *See Dulaney v. Okla. State Dep't of Health*, 868 P.2d 676 (Okla.

1993) (analyzing adjacent land and mineral interest owners' right to notice and an

opportunity to be heard before granting permit to build a landfill next to their property);

*Sharp v. 251st Street Landfill, Inc.*, 925 P.2d 546 (Okla. 1996) (holding that a permanent

injunction was properly issued where an adjacent landowner sought injunctive relief to

enjoin construction of a landfill); *Messer-Bowers Co., Inc. v. State of Okla. ex rel. Okla.*

*Water Res. Bd.,* 8 P.3d 877 (Okla. 2000) (discussing the parameters of the Oklahoma Water

Resources Board's decision-making authority and specifically addressing a permit requested

by the owner and operator of a swine operation). These cases are not relevant to the internal

environmental whistleblowing alleged in this case and, in any event, do not provide a

statement of clear and compelling public policy relevant to Wood's claim. Accordingly,

Defendants are entitled to judgment as a matter of law on the *Burk* claim, and it is not

necessary for the Court to analyze the factual record.[11]

E.     Breach of Contract

Oklahoma is an at-will employment state where an employer "can discharge an

employee for any reason, in the absence of a contractual provision to the contrary." *Bowen*

*v. Income Producing Mgmt. of Okla., Inc.*, 202 F.3d 1282, 1284 (10th Cir. 2000). Wood has

---

[11] In his response brief to Defendants' motion for summary judgment, Wood
identified, for the first time, the following as support for his *Burk* claim: OKLA. STAT. tit.
17, § 302; OKLA. STAT. tit. 27A § 1-1-201; *Gilmore v. Egonex, Inc.*, 878 P.2d 360 (Okla.
1994); *Wheles v. Willard Grain & Feed, Inc.*, 964 P.2d 204 (Okla. 1998). This
information was provided to Defendants as a "supplemental" discovery response on
September 25, 2006, three days following the filing of Wood's response brief and two
months after the expiration of the discovery deadline of July 24, 2006. (*See* Ex. 18 to
Defs.' Reply.) The Court finds this "supplementation" of discovery responses to be out
of time and out of compliance with the Court's prior Order. The Court will not consider
these newly identified bases for Wood's *Burk* claim.

no written employment contract with Defendants.  Instead, Wood's breach of contract claim is based on a theory that a former version of Defendants' employment manual created an implied contract and that Defendants breached the contract by failing to follow the manual's policy of progressive discipline in their termination of Wood.

To determine whether the parties intended to form an implied contract of employment, "five factors are balanced: (a) evidence of "separate consideration" beyond the employee's services; (b) length of employment; (c) employer handbooks and policy manuals; (d) detrimental reliance by the employee; and (e) promotions and commendations." *Id.*  Significant in this case, "'[a]n employer may deny (or disclaim) any intent to make the provisions of a personnel manual part of an employment relationship' so long as the disclaimer is clear and the employer's conduct does not negate the disclaimer's effect." *Id.* If an employer makes such a disclaimer, the handbook's provisions do not weigh in favor of finding an implied contract.  *Id.* at 1286-87.

The only evidence presented by Wood on this claim relates to a policy of "progressive discipline" that was allegedly set forth in a policy manual in existence when Wood began his employment in 1995.  Accordingly, the Court will focus on that factor.  On March 13, 1995, Wood signed a form acknowledging that he had reviewed a "Policy Manual."  (*See* Ex. J to Plf.'s Resp. to Defs.' Mot. for Summ. J.)[12]  This 1995 policy manual,

---

[12]  Wood has given somewhat conflicting testimony regarding whether he reviewed an employee handbook or policy manual in 1995.  (*Compare* Wood Dep. 31:5-22, Ex. 1 to Defs.' Mot. for Summ. J. *with* Wood Aff. ¶ 25, Ex. C to Plf.'s Resp. to Defs.' Mot. for Summ. J.)  The Court assumes, for purposes of this motion, that he did review the policy manual.

however, is not part of the record.  To establish that Defendants created an implied contract to use progressive discipline in the 1995 policy manual, Wood relies on (1) his memory that Defendants promised the use of progressive discipline (*see* Wood Aff. ¶¶ 25, 26, Ex. C. to Defs.' Mot. for Summ. J.), and (2) Neal's testimony that Defendants followed a policy of progressive discipline and that Neal could not terminate employees without following this procedure (*see* Neal Aff. ¶ 13, Ex. B to Defs.' Mot. for Summ. J.).

Defendants have submitted a copy of the current employee handbook, which has been used by Defendants since 1999.  The 1999 employee handbook contains an express statement that "employees who do not have a separate, written employment contract with the company for a specific term of employment are employed at the will of the company" and that "the company may end an employee's employment at any time, with or without notice or cause." (*See* Ex. 2 to Defs.' Mot. for Summ. J.)  It further contains a disclaimer that "nothing in this material represents a contract of any kind."  (*See id.*)

First, the Court concludes that Wood has presented insufficient evidence to establish any type of implied employment contract created by a 1995 policy manual that is not part of the record.  Second, the Court concludes that, in any event, the 1999 version of the employee handbook governs Wood's termination.   The 1999 handbook makes clear that employment is at will, disclaims any intent to make procedures in the manual an implied contract, and does not even contain a "progressive discipline" provision.  Wood would apparently have the Court ignore the current handbook because there is no acknowledgment form in the record establishing that Wood read the 1999 manual.  This argument is unavailing in light of Wood's position as VPO.  Wood was responsible for all Continental operations and was ultimately responsible for implementing policies set forth in the 1999

handbook.  Wood's argument that a prior version of the handbook should apply to him, rather than the current handbook that governed his subordinates, is unpersuasive.  Third, as argued by Defendants in their reply, even if Wood had created a question of fact as to whether progressive discipline was routinely used for Continental's employees, such procedure would not necessarily apply to officers of the corporation who reported directly to upper management at Handy & Harman.  Accordingly, the Court finds this factor does not weigh in favor of an implied contract.  Plaintiff has presented no evidence regarding the other four factors other than a significant length of employment.  The Court holds that Wood's evidence is insufficient to create a question of fact as to the existence of an implied employment contract.

F.     Negligent/Intentional Infliction of Emotional Distress

Wood concedes that negligent infliction of emotional distress is not an independent tort under Oklahoma law, *see Kraszewski v. Baptist Med. Ctr. of Okla., Inc.*, 916 P.2d 241, 243 n.1 (Okla. 1996), and that his claim is actually one for common law negligence.  Wood's interrogatory responses indicate that his negligence claim relates to negligence committed by Defendants in their termination of Wood.  (*See* Plf.'s Resp. to Defs.' First Interrogatories, Ex. 11 to Defs.' Mot. for Summ. J.)  The Court has rejected all theories of wrongful termination and therefore any potential negligence claim is barred as a matter of law.

Oklahoma recognizes intentional infliction of emotional distress as an independent tort.  *Eddy v. Brown*, 715 P.2d 74, 76 (Okla. 1986).  In Oklahoma, to prove intentional infliction of emotional distress, a plaintiff must meet the narrow standards of RESTATEMENT (SECOND) OF TORTS § 46, which provides in pertinent part:  "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another

22

is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." RESTATEMENT (SECOND) OF TORTS § 46. "[L]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *See Breeden v. League Servs. Corp.*, 575 P.2d 1374, 1376 (Okla. 1978) (citing RESTATEMENT (SECOND) OF TORTS § 46).  It is the trial court's responsibility initially to act as gatekeeper -- to determine first whether the defendant's conduct may reasonably be regarded as sufficiently extreme and outrageous to sustain a claim.  *See id.* at 1377.   Likewise, it is for the court to determine whether, based upon the evidence presented, severe emotional distress can be found.  *See id.*

The only evidence offered by Wood that Defendants intentionally inflicted emotional distress upon him in the course of his termination is as follows:

> I do not know why the Defendants believed it was necessary for me to be summoned to come to Rye, New York for me to be fired.  That could and should have been done in Tulsa, Oklahoma.  It was especially embarrassing and intimidating for me to have to come to Rye, New York for the termination. It was, of course, very emotionally difficult to lose my job; however, the distress was magnified many times because of the way in which it occurred.  I cannot remember a time in my adult life when I have experienced so much emotional distress as I did because of the way in which I was fired.

(Wood Aff. ¶ 27, Ex. C to Plf.'s Resp. to Defs.' Mot. for Summ. J.)  Based on review of Oklahoma and Tenth Circuit law, Plaintiff's being forced to fly to New York for the termination meeting is insufficient to support a claim for intentional infliction of emotional

distress in the employment law context.  Employers' conduct has been deemed insufficient to give rise to a claim for intentional infliction of emotional distress in cases with significantly more compelling facts than those presented.  *See, e.g.*, *Merrick v. Northern Natural Gas Co.*, 911 F.2d 426, 433 (10th Cir. 1990) (plaintiff alleged employer harshly criticized him, yelled at him, and cursed at him prior to his termination); *Eddy*, 715 P.2d 74 (plaintiff alleged multiple instances of ridicule and harassment of employee); *Miner v. Mid-America Door Co.*, 68 P.3d 212 (Okla. Ct. App. 2002) (plaintiff alleged he suffered verbal abuse regarding employee's sexuality and physical threats); *Mirzaie v. Smith Cogeneration, Inc.,* 962 P.2d 678 (Okla. Ct. App. 1998) (plaintiff alleged employer called plaintiff in the middle of the night and browbeat him for hours, required him to do unnecessary work, and made derogatory sexual comments about the plaintiff's fiancee).  Defendants are entitled to judgment on this claim as a matter of law.

## IV.    Conclusion

Defendants Handy & Harman and Continental Industries, Inc.'s Motion to Strike Plaintiff's Affidavit Exhibits Attached to Plaintiff's Brief in Response to Defendant's Motion for Summary Judgment ("Motion to Strike") (Docket No. 123) is GRANTED in part and DENIED in part.  Defendants Handy & Harman and Continental Industries, Inc.'s Motion for Summary Judgment (Docket No. 94) is GRANTED in its entirety.

**ORDERED this 6th day of November 2006.**

*Terence Kern*

**TERENCE KERN**
**UNITED STATES DISTRICT JUDGE**

24